RENDERED: NOVEMBER 1, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2016-SC-000246-DG

DATE 2/14/19 Kim Redmon, DC

MICHAEL SCALISE, ANNE BRAUN,                        APPELLANTS
AL HUBER, JONATHAN LEACHMAN,
STEVE MILLER, JUDY SCHWENKER,
MARK STEVENS, AND GARY VOGEL


                          ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2014-CA-000915-MR
            JEFFERSON CIRCUIT COURT NO. 13-CI-006719


SUZETTE SEWELL-SCHEUERMANN                              APPELLEE


## OPINION OF THE COURT BY JUSTICE HUGHES

## AFFIRMING IN PART, REVERSING IN PART AND REMANDING

The City of Audubon Park (City) is a small city located in Jefferson County, Kentucky. Beginning in fiscal year 2007-2008 and continuing through fiscal year 2012-2013, the City's Mayor and City Council approved annual ordinances setting out a monthly assessment for the stated purpose of paying for sanitation services, including trash collection and recycling. However, the assessment generated more revenue than the cost of the City's contract with a private company for trash collection and recycling. The City diverted this surplus revenue into its general fund and subsequently used it for other City expenditures.

In 2013, Suzette Sewell-Scheuermann, acting "as a taxpayer for the use and benefit of the City," brought this action pursuant to Section 180 of the Kentucky Constitution and, more specifically, Kentucky Revised Statutes (KRS) 92.330 and 92.340 seeking to recover the surplus sanitation revenue that was not devoted to trash collection and recycling. The cited constitutional provision and the statutes prohibit cities from collecting taxes for one purpose and spending them for another. The circuit court dismissed the action for failure to state a cause of action due to lack of injury to the City, but the Court of Appeals reversed, concluding that pursuant to the statutes cited, the former Mayor and individual members of the City Council were personally liable for the excess sanitation funds, even though those funds had been spent for other municipal purposes.

This case requires us to consider for the first time the import of KRS 92.330 and 92.340, statutes adopted some seventy-five years ago but having their origins in statutory provisions from the late nineteenth century. While there is an initial question as to whether the assessment qualifies as a tax or a user fee, that is easily disposed of and takes us to the more pertinent issues of whether a cause of action was stated and whether in these circumstances individual liability is absolute. We conclude that the complaint states a cause of action, but liability is not absolute in this case if the individuals who acted on behalf of the City can establish that the tax revenue was spent for valid City obligations. Accordingly, we affirm in part and reverse in part the Court of Appeals' opinion and remand the case to the circuit court for further

proceedings. We further hold that going forward the offset defense which has been judicially recognized in these circumstances will no longer apply. Prospectively, the statutes will be followed as written by our legislature, with an accommodation or defense, if any, for city officials who act in good faith a matter left entirely to the discretion of the General Assembly.

## FACTS

Audubon Park is a former fifth-class city.[1] Sewell-Scheuermann, "as a taxpayer for the use and benefit of the City," filed a complaint against Mayor Michael Scalise and the following members of the City Council: Anne Braun, Al Huber, Jonathan Leachman, Steve Miller, Judy Schwenker, Mark Stevens, and Gary Vogel.[2] The complaint alleges that the Mayor and City Council members (hereafter collectively referred to as "Defendants") violated Kentucky Constitution Section 180 and KRS 92.330 and 92.340 through their improper use of sanitation assessment funds from 2007 through 2013. Sewell-Scheuermann claims that, as a taxpayer, she has the right to recover the excess sanitation assessment revenue, totaling over $773,000,[3] for the benefit of the City.

---

[1] We refer to Audubon Park as a "former" fifth-class city because it was so classified at the time relevant to this litigation. However, effective January 1, 2015, the legislature amended the Kentucky statutes to dispense with the second, third, and other numbered classes and, instead, provided that going forward there would only be two classes of cities in Kentucky — first-class and home rule class. KRS 81.005. Audubon Park is now a city of the home rule class.

[2] None of these individuals is currently serving in an official capacity for the City but they were at times relevant to this litigation.

[3] From the record, it appears that the amount of excess revenue is somewhere between $773,000 to $869,100.

3

The revenue in question was collected pursuant to a series of annual ordinances entitled "An Ordinance Adopting the Garbage Recycling Collection Assessment for the City of Audubon Park, Kentucky for [Appropriate Fiscal Year from 2007-2008 through 2012-2013] and Providing for the Collection of Same." Each annual ordinance provided for a monthly assessment based on the classification of the City resident. In the initial ordinance, single family residences paid $34 monthly as did duplexes and apartments (on a per unit basis) as well as commercial entities. Churches were not assessed any liability. By the sixth and final ordinance, all residences (but not churches) were paying $45 monthly. The ordinances further provided: "The foregoing assessment shall be a part of the tax bill of the City of Audubon Park and shall be due and payable at the same time and place with the same discounts, interest and penalties as real estate taxes in the City of Audubon Park."

In their answer to the complaint, the Defendants asserted numerous defenses, including laches, the statute of limitations, unjust enrichment, set-off, and that the fee charged for sanitation services was a "user fee," not a tax. If the "user fee" characterization is accurate, KRS 92.330 and 92.340 would not apply.

The Defendants then moved to dismiss the complaint under Kentucky Rule of Civil Procedure (CR) 12.02 for failure to state a claim because the diverted funds were used for the City's benefit and therefore the City suffered no harm. The trial court granted the motion to dismiss, holding that since the

4

diverted funds were used to pay for the City's financial obligations Sewell-Scheuermann was not entitled to any relief on behalf of the City.

On appeal, the Court of Appeals found that KRS 92.330 and 92.340 are clear and unambiguous and that Sewell-Scheuermann had satisfied all elements of the statutes. In that court's view, the use of excess funds solely for the City's benefit was no defense, and the Defendants are thus jointly and severally liable to the City. The Court of Appeals concluded that the "object to be attained" by the sanitation assessment has not been accomplished at any given time because the tax is levied for ongoing waste disposal and that the City should have used any surplus funds for sanitation in the next fiscal year instead of diverting them to another purpose. Highlighting that the statutes at issue serve to prevent a city from levying a tax at a rate higher than necessary to accomplish its stated purpose, the Court of Appeals reversed the trial court's decision and remanded for further proceedings.

On review by this Court, the Defendants argue that the Court of Appeals' opinion should be reversed for the following reasons: (1) this Court's decision in *Klein v. Flanery*, 439 S.W.3d 107 (Ky. 2014), and interpretation of Kentucky Constitution Section 180 compel reversal; (2) the case was properly dismissed at the trial court for lack of damages and due to an offset defense; (3) the imposition of personal liability on the City officials leads to an "absurd result" and creates a "chilling effect" on the willingness of citizens to serve in local government; and (4) the Court of Appeals' decision exceeded the scope of review under Kentucky law.

5

We granted discretionary review to determine whether Sewell-Scheuermann has stated a cause of action and whether the Defendants are personally liable for the expenditure of the excess funds. Because the cited statutes are not relevant unless a tax is involved, we begin with the threshold issue of whether the Audubon Park assessment is a user fee rather than a tax.

## ANALYSIS

### I. The Sanitation Assessment Is Not a User Fee.

Section 180 of the Kentucky Constitution provides:

> Every act enacted by the General Assembly, and every ordinance and resolution passed by any county, city, town or municipal board or local legislative body, levying a tax, shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose.

This provision has existed since the adoption of the 1891 Kentucky Constitution.[4] KRS 92.330 and 92.340, discussed in detail below, expand on this central proposition regarding city taxes and provide the "recovery right" asserted on behalf of the City in this case.[5]

Beginning in 2007 and continuing throughout the period at issue, the City referred to the monetary obligation in the Audubon Park sanitation

---

[4] The original section had an introductory sentence that provided: "The General Assembly may authorize the counties, cities or towns to levy a poll tax not exceeding one dollar and fifty cents per head." The 1990 General Assembly proposed eliminating Section 180 in its entirety but when it was placed before the voters the proposal was defeated. Six years later, the General Assembly successfully proposed amending the section to delete the first sentence, a revision which Kentucky voters ratified in November 1996. Compiler's Notes, § 180 Ky. Const., Michie's Ky. Rev. Statutes (2014).

[5] KRS 92.330 and 92.340 refer to both taxes and "license fees," but the latter is of no significance in this dispute since the allegation is that the City's sanitation assessment was a "user fee," not a license fee.

6

ordinances as an "assessment." Clearly, the cited constitutional and statutory provisions are relevant to "taxes" so the proper characterization of the monies paid into the City's coffers is highly relevant. The Defendants asserted in their answer to the complaint that the assessment was a "fee and/or tax" and they continued that same indefinite characterization of the sanitation assessment in the motion to dismiss. The proper characterization was not part of the trial court's disposition of the case because, referring to the assessment as a "sanitation tax," that court concluded Sewell-Scheuermann had failed to prove any damages incurred by the City. In that court's view, "'there must be a juncture of wrong and damage to give rise to a cause of action.'" (quoting *City of Newport v. Rawlings*, 289 Ky. 203, 158 S.W.2d 12, 14 (1941)).

While the trial court sidestepped the issue and the Court of Appeals did not address it, *amicus curiae* Kentucky League of Cities insists the ordinance imposes a user fee, rendering KRS 92.330 and 92.340 irrelevant. Although this Court does not typically address issues not fully developed in the lower courts, and propounded in this Court primarily by an *amicus*, this threshold consideration deserves our attention because if the sanitation assessment is indeed a user fee the premise of this entire lawsuit — improperly spent tax revenues — dissolves.

Fortunately, the General Assembly has provided the definition of a "user fee" in KRS 91A.510. It is defined as "the fee or charge imposed by a local government on the user of a public service for the use of any particular service

7

*not also available from a nongovernmental provider.*" (Emphasis supplied.)[6] While trash collection and recycling may be deemed a "service," it is plainly not one that is "not also available from a nongovernmental provider" because in this very case the City contracted with a nongovernmental provider — a private trash collection company — to provide the service. The sanitation assessment is, thus, not a user fee under Kentucky law.

Recently, in *Greater Cincinnati/Northern Kentucky Apartment Association v. Campbell County Fiscal Court*, 479 S.W.3d 603 (Ky. 2015), this Court addressed a local assessment and the tax *vis-a-vis* user fee distinction. That case involved the levy of an annual $45 service fee upon each occupied individual residential and commercial unit within Campbell County to defray the costs of the local emergency 911 service. The Association maintained that the fee was an impermissible user fee that violated KRS 91A.510 because it was not based on actual use of the benefit received, *i.e.,* there was no correlation between use of the 911 service and the individual residences and businesses. *Id.* at 605. This Court concluded that the emergency 911 service was authorized by the legislature in 1984 two years prior to the adoption of the user fee statutes in KRS 91A.510-.530, and the fees referred to in that 1984 emergency 911 service statute, KRS 65.760, were authorized without regard to the later user fee strictures. The Court held that there had to be a reasonable relationship between the fee and the benefit received, and finding one, upheld

---

[6] KRS 91A.520 prohibits a user fee that generates "revenues or profits in excess of the reasonable costs associated with providing a public service."

the 911 service fee as "a constitutional and statutorily valid exercise" of the County's authority. *Id.* at 607.

Here, there is no specific statute, as there was in *Greater Cincinnati/Northern Kentucky Apartment Association* for 911 service, regarding fees for trash/recycling services in a former fifth-class city. There was and is a statute authorizing a rate variation in local ad valorem taxes in cities of the first- through sixth-class (now applicable to cities of any class) specifically addressed to nonrevenue-producing governmental services including but not limited to "police protection, fire protection, streets, street lighting, sidewalks, water service, and sewer facilities." KRS 82.085. However, the statute refers to services and benefits "which are available in one (1) or several areas of a taxing district in contrast to other areas of the same taxing district in which those services and benefits are not available." KRS 82.085(1). Assuming trash/recycling services could be governmental services under this statute, the statute would still be inapplicable because those services were apparently available throughout the City of Audubon Park. Now, effective January 1, 2015 (and therefore *after* the time periods at issue in this case), there is a specific statute authorizing cities to impose a "supplemental tax" for services such as "garbage collection." KRS 82.095. The supplemental tax is not to exceed the cost of the services and is only required to be apportioned in a reasonable manner based on services "actually received," KRS 82.095(3), but the statute only applies to cities with a population of 3,000 to 19,999. This statute thus

9

post-dates the ordinances at issue here and would not apply, in any event, because Audubon Park does not meet the population threshold.

While there is no specific statute requiring the Audubon Park sanitation assessment to be deemed a tax, Sewell-Scheuermann notes that even if the assessment is some type of fee, historically this Court and its predecessor have treated excess fees as taxes. *Martin v. City of Greenville*, 227 S.W.2d 435, 437 (Ky. 1950) (excess license fee on apartment houses "would fall into the revenue class"); *City of Henderson v. Lockett*, 163 S.W. 199, 201 (Ky. 1914) (local license fee on automobiles is valid exercise of police power but any excess over cost of issuing license and regulating "amounts to a tax for revenue"). Most recently, in *Klein* we noted that any exaction by a governmental entity can be thought of as a tax of sorts but in the strict sense a tax is "levied to meet the general expenses of government" and is distinguishable from particularized exactions such as fines, user fees, infrastructure fees and regulatory fees. 439 S.W.3d at 114 n.6. Regulatory fees cease to be fees and become taxes when "the amount exacted becomes disproportionate to the amount expended for regulatory purposes." *Id.*

Given the foregoing, it is clear that the Audubon Park sanitation assessment is not properly designated a "user fee" but to the extent it was a fee/assessment for a local governmental service the excess revenues generated may properly be deemed taxes. This classification issue requires further consideration of *Klein v. Flanery*, a case relied on by the Defendants.

## II. *Klein v. Flanery* Does Not Compel a Ruling in Favor of the Defendants.

In *Klein v. Flanery*, two groups of plaintiffs who had paid regulatory fees to the state challenged the General Assembly's transfer of excess funds in those regulatory agency accounts to the General Fund for use in the annual state budget. Licensed building contractors who had paid licensing, permit and inspection fees to the Department of Housing, Buildings and Construction, and non-profit organizations who had paid license fees to the Department of Charitable Gaming alleged in part that the transfers to the General Fund violated Section 180 of the Kentucky Constitution. Their theory was if the monies collected were taxes then Section 180 prohibited their transfer for a different purpose than that for which they were collected but even if they were regulatory fees any excess over the amounts needed for regulatory functions would amount to "a tax for revenue" and thus still violate Section 180. 439 S.W.3d at 113-14 (citing *City of Henderson*, 163 S.W. at 201). Upholding the transfers, this Court first noted that Kentucky has long recognized that because it is difficult to "fix accurately a tax rate to meet exactly a liability[,]" when the object of a tax levy is met any excess funds can be transferred to a general fund because otherwise those excess funds would be "entirely unavailable for any public purpose." *Id.* at 115 (citing *Whaley v. Commonwealth*, 61 S.W. 35, 39 (Ky. 1901)). The Court similarly focused on "the impossibility for any given fiscal period of precisely matching income and expense" as a rationale for concluding that the lapse or transfer of regulatory fees to the state's General Fund did not transform them into an unlawful tax.

11

*Id.* "Where the amount exacted does not exceed what is reasonably necessary for regulatory purposes, the fact that, in a given fiscal period, the amount actually collected turns out to be somewhat more than the amount actually expended, . . . does not, without more, convert a valid fee into an invalid tax." *Id.* at 115-16. In that case, the regulatory fees were not so disproportionate to the expenses for regulation of building and construction trades or charitable gaming that the annual surpluses could be deemed taxes.

While the Defendants maintain that *Klein* underscores the propriety of their use of excess sanitation assessment revenues for other valid city expenditures and fully refutes Sewell-Scheuermann's claims, she aptly notes that the cases are distinguishable. First, *Klein* involved state funds and thus only addressed Section 180 and not the statutes relied on in this case, KRS 92.330 and 92.340, which are specifically applicable to city taxes. Second, the general principle allowing use of surplus tax revenues (or surplus fees that "become" taxes) for other purposes presumes that there was a reasonable correlation between the assessment and the object to be accomplished, *e.g.*, the regulatory purposes of the Department of Charitable Gaming or the Department of Housing, Buildings and Construction. Here, the City contracted with a private company for trash collection and recycling so there was a specific amount owed; it was *not* impossible to "precisely match[] income and expense." *Klein*, 439 S.W.3d at 115. On that score alone, the general premise recognized in *Klein* appears to be missing. When the annual sanitation assessment ordinances were passed and the monies collected, it was

12

abundantly clear that excess funds would be generated. So even if the sanitation assessment was a service fee of some sort, the predictable excess regularly devoted to the City's general expenditures is properly viewed as a tax. With that conclusion, we turn to KRS 92.330 and 92.340 and Sewell-Scheuermann's claim that she is entitled to recover on behalf of the City over $773,000 from the individual Defendants.

### III. KRS 92.330 and 92.340 Preclude Using Sanitation Revenue for Other Purposes but Current Kentucky Law Does Not Preclude an Offset Defense Where That Revenue Has Been Spent on Other Valid City Obligations.

Although Sewell-Scheuermann cites Section 180 and the general principle of not using taxes assessed for one purpose for another, different purpose, her claim is more narrowly focused on two statutes that were contained in the 1942 statute revision. These statutes now provide:[7]

> All taxes and license fees levied or imposed by cities of the home rule class shall be levied or imposed by ordinance. The purpose for which each tax is levied or license fee imposed shall be specified in the ordinance, and the revenue therefrom shall be expended for no other purpose than that for which the tax was levied or the license fee imposed. Failure to specify the purpose of the tax or license fee shall render the ordinance invalid.

KRS 92.330.

> If, in any city of the home rule class, any city tax revenue is expended for a purpose other than that for which the tax was levied or the license fee imposed, each officer, agent or employee who, by a refusal to act, could have prevented the expenditure, and the members of the city legislative body who voted for the expenditure, shall be jointly and severally liable to the city for the amount so expended. The amount may be recovered of them in an

_____

[7] See footnote 1 regarding the reclassification of cities, resulting in there now being only two classes — first-class and home rule.

13

action upon their bonds, or personally. The city attorney shall prosecute to recovery all such actions. If he fails to do so for six (6) months after the money has been expended, any taxpayer may prosecute such action for the use and benefit of the city. A recovery under this subsection shall not bar a criminal prosecution. Any indebtedness contracted by a city of the home rule class in violation of this subsection or of KRS 92.330 and 91A.030(13) shall be void, the contract shall not be enforceable by the person with whom made, the city shall never assume the same, and money paid under any such contract may be recovered back by the city.

KRS 92.340.

These statutes were preceded by somewhat similar statutes in the 1894 Laws of Kentucky. Chapter 100, Article VIII, Section 2 of the 1894 Laws required a municipal tax ordinance to state its purpose and, if that purpose was omitted, the ordinance was invalid, rendering the members of the city council jointly and severally liable for any expenditures of the revenues collected pursuant to the ordinance. The city solicitor was charged with pursuing the recovery but if he failed to do so for six months then any person could institute the action and retain one-half of the recovery. The statute noted that it did not "militate against [a] criminal prosecution." *Id.* A revision of the statutes in 1898 resulted in the same statute being renumbered as Ky. Stat. § 3175, the statute cited in two of the older cases pertinent to the matter before us.[8]

---

[8] In its entirety § 3175 provides:

All taxes and license fees shall be levied or imposed by ordinance, and the purpose or purposes for which the same are levied or imposed shall be specified therein, and the revenue therefrom shall be expended for no other purpose than that for which it is collected. Ordinances levying taxes or imposing license fees shall distinctly specify the purpose or several purposes for which the same are levied; failure to do so shall

14

In *City of Newport v. McLane*, 256 Ky. 803, 77 S.W.2d 27, 29 (1934), the Newport mayor and council members, who were also members of the board of commissioners of the sinking fund, "transferred temporarily" monies from the sinking fund to various sub-funds of the city's general fund, leaving a deficiency of slightly over $79,000 when all of their terms expired. In an action by the city against the former mayor and council members, numerous statutes, including Ky. Stat. § 3175, and Section 180 of the Kentucky Constitution were cited for the proposition that those individuals were personally liable for the revenues collected for one purpose and "diverted" to other city purposes, *i.e.*, the sinking fund monies used for other city purposes such as the departments of public safety and public works. This Court's predecessor held that the language of Section 180 and Ky. Stat. § 3175 was "too plain, simple, and free from ambiguity and doubt to be misunderstood . . . ." *Id.* at 31. "The measure of the recovery as to the members of the board [the mayor and city council members] is the sum diverted, and as to the sureties, not exceeding the amount of their several bonds." *Id.* at 33. However, the Court further held

render the ordinance invalid, and if it shall, the officer or officers, agents or employees, who could, by a refusal to act, have prevented the expenditure, and the members of the general council who voted for the expenditure, shall be jointly and severally responsible and bound to the city for the amount of such expenditure. And it may be recovered of them in an action upon the bonds of those having them, or personally against any or all of them; and it shall be the duty of the city solicitor to institute and prosecute to recovery such actions; and if he fails to do so for six months after he shall have knowledge of the same, any person may institute the action, and shall have one-half of the recovery. A recovery hereunder shall not militate against the criminal prosecution herein elsewhere provided.

15

that the individuals were not personally liable (nor the sureties) for the amounts so expended to the extent they could show the monies were spent on other valid city debts. *Id.* As the Defendants in this case correctly note, the statute and the offset defense were employed in *McLane* with respect to a valid ordinance — one that stated a particular purpose — illustrating that the precedent established in that case and followed in several others was not dependent upon an invalid ordinance, *i.e.*, an ordinance failing to specify the purpose of the tax.

Seven years later, in *City of Newport v. Rawlings*, 158 S.W.2d at 12, Newport was once again at the center of a lawsuit citing Section 180 of the Kentucky Constitution and Ky. Stat. § 3175 among other statutes. On this occasion, Rawlings, the city manager, and other city officers were charged with having failed to pay into the sinking fund, the education fund, the teachers' annuity fund, and the police and firemen's pension fund monies levied for those specific purposes. The Court relied on its earlier decision, noting:

> When money, which should have been allocated to various funds for which it was levied and apportioned, was used for other purposes there was a clear violation of section 180 of the Constitution prohibiting a tax levied and collected for one purpose from being diverted to another purpose. Under the rule announced in the McLane case if it is established that the money diverted was used in the payment of *valid* obligations of the city then there is no liability on the part of those responsible for the diversion. If, however, money levied for one purpose is expended in paying invalid claims against the city those responsible for such unlawful diversion and illegal payments are, of course, liable therefor.

158 S.W.2d at 15.

16

Although the *Rawlings* defendants claimed entitlement to the presumption that they had fulfilled their official duties and spent the funds appropriately, the Court concluded otherwise: "A diversion in violation of law being established, the burden should be on the officers . . . to establish that no damage resulted to the city by showing that the diverted funds were expended in payment of valid obligations . . . ." *Id.* The Court's opinion drew from the "elementary and fundamental" rule, cited by the trial court in this case, that "a violation of a right is not sufficient . . . there must be a juncture of wrong and damage to give rise to a cause of action." 158 S.W.2d at 14. Accordingly, the *Rawlings* defendants were not liable to the extent the revenues had been used for valid city purposes.

Finally, Owensboro was at the center of *Daily v. Smith's Adm'x*, 297 Ky. 689, 180 S.W.2d 861 (1944), a case involving diversion of bond proceeds for acquisition and operation of an electric plant to cover prior city expenses for water and electricity. Although Ky. Stat. § 3175 was not involved, a similar concept for bond revenues was at issue and the Court looked to the *City of Newport* cases in concluding that the mayor and commissioners were entitled to an offset to the extent the electric plant bond revenue was spent on other valid city expenditures. As the Court succinctly stated:

> Now, the city lost nothing in the transaction. Should judgment be collected against the officials personally, the city would be ahead by that amount. Its debts would all have been paid and the recovery would be only profit, through the imposition of a judgment in the nature of a penalty.

180 S.W.2d at 864.

17

Sewell-Scheuermann disputes the validity of the offset defense that has emerged from these cases[9] by pointing out that none of them involved the statutes at issue here, KRS 92.330 and 92.340. While that is true, the *City of Newport* cases both addressed Ky. Stat. § 3175, a direct predecessor to KRS 92.330 and 92.340. That statute had a similar seemingly absolute recovery right against city officials on behalf of the city; more incentives for an individual to pursue recovery (she was entitled to retain half of the recovery); and similarly strong liability language suggesting strict liability on the part of the city's officers and agents. In short, it had all the salient features of our current KRS 92.330 and 92.340. Nevertheless, this Court's predecessor consistently recognized the right of the city officials who spent the monies on other city debts to be relieved of liability to the extent that they could establish the propriety of the other municipal expenditures. While there is more to consider with regard to the 1942 statutory revision and the current statutes, suffice it to say that the revision and renumbering of the Kentucky statutes did not render the *City of Newport* and *Daily* cases irrelevant to the matter at hand.

Sewell-Scheuermann also asks us to distinguish the foregoing cases because Ky. Stat. § 3175 addressed only *invalid* ordinances, *i.e.,* ordinances that failed to specify the purpose of the tax, as opposed to valid ordinances, as here, where funds were collected for a specific purpose and then diverted to

---

[9] Although it does not use the term offset, the same concept was applied in an action against Elliott County officials in *Fannin v. Davis*, 385 S.W.2d 321, 327 (Ky. 1964), a case involving a statute providing for strict liability for county officials.

another governmental purpose. This distinction does not withstand a close reading of the cases. In *City of Newport v. McLane*, the ordinance specified the purpose of the tax levy, "paying the bond indebtedness," and then the funds were spent in other municipal departments. 77 S.W.2d at 29. There was a valid ordinance and subsequent diversion. In the *Rawlings* case, the Court found "a failure to pay into the sinking fund [monies] levied and apportioned therefor. There was also a failure to pay to the board of education, . . . the sum of $12,211.87 levied and collected for that purpose . . . ." 158 S.W.2d at 13. *Rawlings* thus also involved a valid ordinance and diversion of funds. Finally, in *Daily*, the bond issue was pursuant to an ordinance indicating that the revenue would be spent "for the purpose of defraying the cost of extending and improving the municipally owned electric light and power system . . . ." 180 S.W.2d at 863. Again, there was a valid ordinance and diversion to other expenses, in that case earlier water and electric debts. In sum, to the extent Ky. Stat. § 3175 referred to an *invalid* ordinance it was not necessarily just one that failed to identify the specific purpose of a tax levy. Kentucky courts applied the statute in cases where there was a specific purpose stated in the city ordinance but the funds were spent for other purposes. Perhaps those courts viewed the ordinances at issue as invalid in fact, if not on their face, because the funds were not levied and collected for the purposes stated.[10]

---

[10] Notably, in *Duncan v. Combs*, 131 Ky. 330, 115 S.W. 222 (1909), the Court acknowledged the statute, § 3175, that emerged from the "enrolled bill" was different from that reflected in the journals of the House and Senate. Those journals apparently reflected passage of a statute *not* limited to "invalid" ordinances but the Court held that "without regard to the rule that obtains in other jurisdictions, . . . [in

19

Regardless, this Court's predecessor developed and applied the offset defense in cases just like this one where a particular purpose was stated and the funds were used for a different purpose.

As an additional challenge to the offset defense, Sewell-Scheuermann points to former KRS 92.360, a statute that was adopted with 92.330 and 92.340 in 1942 but repealed in 1980. That statute provided in relevant part:

> (2) The legislative body of any city of the second to sixth class shall not, in any year, expend any money in excess of the amount levied and collected for that year or levied, collected or appropriated for any special purpose, and shall not expend, or permit or authorize to be expended, any city revenue raised by taxes or license fees, for any purpose, other than that specified in the ordinance levying the tax or imposing the license fee.

> (3) No member of the legislative body of any city of the second to sixth class shall knowingly vote for any appropriation or contract in violation of this section or of KRS 92.330 to 92.350, and no officer of such city shall knowingly do any act to impose upon the city any pecuniary liability in excess of the limitations of this section and of KRS 92.330 to 92.350.

> (4) Where the special object or purpose for which a tax was levied by any city of the second to sixth class has been accomplished, any amount remaining in the special fund for that tax shall become a part of the general revenue fund of the city. In any city of the second, third, fourth, fifth or sixth class where all or any part of a special fund so transferred to the general fund remains unexpended and has not been commingled with other funds in such a way as to lose its identification, the city may return the same to a special reserve fund for an object or purpose similar to that for which the fund was originally accumulated and may invest

---

Kentucky] the enrolled bill may not be impeached by the journals of the respective houses." 115 S.W. at 224. So, the *Duncan* Court held Ky. Stat. § 3175 only applied to invalid ordinances but Kentucky courts regularly applied it to cases involving facially valid ordinances — which was the legislature's actual intent. In *D&W Auto Supply v. Department of Revenue*, 602 S.W.2d 420, 425 (Ky. 1980), this Court announced it would no longer follow the enrolled bill doctrine, overruling all cases that followed it "to the extent there is no longer a conclusive presumption that an enrolled bill is valid." *Duncan* was expressly overruled.

the same in investments in which other funds of the city may lawfully be invested until such time as it is necessary to expend the fund for such purpose. (3069, 3070, 4281u-4 to 4281u-6: amend. Acts 1942, ch. 63; 1942, ch. 188.)

Sewell-Scheuermann insists that this statute allowed the repurposing of funds and would have given the Defendants a defense in this case but the repeal indicates that city officials are now to be held strictly accountable for all funds not spent for the precise purpose for which they were collected. We disagree and conclude that the repeal of KRS 92.360 does not reflect the legislature's position, one way or the other, on whether city officials should be held strictly liable for tax revenues collected for one purpose but spent for otherwise lawful different purposes.

First, we note that the statutory history stated in parentheses reflects that KRS 92.360 was derived from several older statutes: Ky. Stats. §§ 3069, 3070 and 4281u-4 to 4281u-6. Ky. Stat. § 4281u pertained to "Tax Levy for and Expenditure of County and Municipal Public Funds," and applied to all cities except those of the first-class and second-class, which were addressed elsewhere in the statutes. Beginning in 1906 and continuing through the 1942 statute revision, Ky. Stat. 4281u-5 provided: "Where the special object or purpose for which a tax was levied and collected has been accomplished, completed and finished, that amount remaining in said special fund, if any, shall pass to and become a part of the general revenue fund of the county, city or town." Thus, statutory authorization for placing excess revenues collected for a specific purpose into a city's general fund for use for other purposes existed at the time of the *City of Newport* and *Daily* cases. KRS 92.360 was not

21

a new 1942 statutory statement of the judicially-recognized offset rule and then a retraction of the same in 1980; it was simply a repackaging of a statute that existed all along, and it was focused on municipal finances, not the personal liability of a city's officials.

The 1980 General Assembly repealed KRS 92.360 via Senate Bill (S.B.) 18, a comprehensive approach to municipal finances including a provision that mandates an annual city budget ordinance and records that comply with generally accepted principles of governmental accounting. *See* 1980 Ky. Acts ch. 232, 694-698 and current KRS 91A.010-.060. In addition to adopting comprehensive city budget measures,[11] S.B. 18 repealed seventeen existing statutes pertaining to city budget practices, appropriations, expenditures, accounting measures and audits. Parts of former KRS 92.360 were inconsistent with or redundant to the new statutes applicable to cities throughout the Commonwealth. Nothing about this action on the part of our General Assembly seems at all directed to the personal liability/offset issue currently before us.

The Defendants maintain, correctly in our view, that KRS 92.360 did not create the offset defense and its repeal did not eliminate it. Indeed, the offset defense was alive and well at the time of the 1942 revision of the Kentucky statutes and the legislature was presumed to be aware of it. As this Court's

---

[11] To assist cities and other local governments in conforming to the new law, the Department for Local Government was required to provide assistance "including the preparation and dissemination of model systems for accounting and budgeting, and other technical materials." KRS 91A.050.

predecessor noted in 1933, "[i]t is presumed that the Legislatures have knowledge of existing laws and the construction placed upon them by the courts." *Baker v. White*, 251 Ky. 691, 65 S.W.2d 1022 (1933). More recently, in *Butler v. Groce*, 880 S.W.2d 547, 549 (Ky. 1994), this Court stated:

> In substantially reenacting a statute, the legislature is well aware of the interpretation of the existing statute and has adopted that interpretation unless the new law contains language to the contrary. *Brown v. Harrodsburg*, Ky., 252 S.W.2d 44 (1952). If the legislators intended to depart from the existing statutory interpretation, it is incumbent that they use "plain and unmistakable language" which leaves no doubt that a departure from the prior interpretation is intended. *Long v. Smith*, 281 Ky. 512, 136 S.W.2d 789 (1940).

The "new" KRS 92.330 and 92.340 hewed closely to the old Section 3175 and the General Assembly made no effort to prohibit offset in "plain and unmistakable language." 880 S.W.2d at 549. Moreover, KRS 92.360 — derived from older statutes — *inter alia* authorized sending excess funds to the general fund but that was directed at municipal finances and not the specific issue of individual liability for use of tax revenues. The subsequent repeal of that provision regarding transfers among municipal accounts, as part of a comprehensive statute addressing local government budgeting and finance, does not reflect a rejection of the offset defense.

Finally, Sewell-Scheuermann insists that recognizing an offset defense for these Defendants is unwarranted and renders the statutes meaningless. While, as discussed *infra*, we will not apply the judicially-created offset defense prospectively it is not entirely baseless as Sewell-Scheuermann suggests, *i.e.*, it is not wholly indefensible from a policy standpoint. Recognizing that a

taxpayer has stated a valid cause of action when taxes levied for one purpose have been expended for another purpose, while continuing to acknowledge the possibility of offset, places the burden on those acting on behalf of a city to account for excess funds to the satisfaction of a court. They must establish that all of the expenditures were for valid municipal obligations and, to the extent the expenditures were not, they are held personally accountable. The offset defense provides a shield of sorts from absolute liability, but it does not relieve the challenged parties from defending their actions in a court of law, an expensive and time-consuming proposition. For city officials who have acted in good faith, if erroneously, the offset defense prevents a scenario where they personally shoulder significant liability even though the excess funds were spent for proper municipal obligations — such as public safety (police) and public works (road crews) — that benefit all taxpayers. We are willing to extend application of the longstanding offset doctrine to the Defendants before us. That said, commendable as the offset defense may seem to some citizens or courts, it is a policy determination that should be left to the legislature going forward.

As further evidence of the continued purposes of these statutes, we note, the statutes regarding civil liability for city officials through the centuries have always provided that a civil recovery "shall not bar a criminal prosecution." KRS 92.340. *See also* Ky. Stat. § 3175 ("A recovery hereunder shall not militate against the criminal prosecution herein elsewhere provided."). In situations where a city's funds have been misappropriated, this language

24

highlights a basis for pursuing criminal charges under the appropriate theft provisions of the Penal Code. In sum, KRS 92.330 and 92.340, though rarely used, continue to be important statutory provisions that provide for accountability on the part of those individuals acting on behalf of Kentucky's cities in the expenditure of public tax revenues.

Looking more closely at the case before us, the limited record contains financial information in the form of the annual proposed budgets for the City. For example, in 2011-2012, the City had a proposed budget with anticipated revenues of $1,060,000, including $300,000 from property taxes and $345,600 from the sanitation ordinance revenue with the remainder being from fines, permits, motor vehicle and insurance taxes, state law enforcement funds, etc. That year's anticipated appropriations included, among other things, $535,000 for Public Safety, consisting exclusively of the Audubon City Police Department, and $184,000 for Sanitation. Other anticipated expenditures included modest salaries for the fulltime City Hall workers, insurance, auditing and PVA fees, a $2,400 salary for the City Attorney and various other seemingly ordinary municipal expenses.[12] It does not take a forensic accountant to surmise (subject of course to closer examination on remand) that the City Council was avoiding the increasingly unpopular action of raising taxes and instead running the City in some part on the fully-expected excess sanitation revenue. Council members should not conduct municipal business in this fashion.

---

[12] The budget anticipated a surplus of $75,200.

25

While we are willing to acknowledge the applicability of the judicially-created offset doctrine to the case before us, the same result will not apply going forward. The *City of Newport* cases created a gray area where city officials who diverted revenue to municipal purposes other than that purpose for which it was raised could avoid the plain language of the statute. This Court concludes that in accord with our obligation to neither "add [n]or subtract from the legislative enactment," it is appropriate to return to that plain language henceforth. *Beckham v. Bd. of Educ. of Jefferson Cty.*, 873 S.W.2d 575, 577 (Ky. 1994). To the extent the *City of Newport* cases stand for the proposition that city officials may levy and collect assessments/taxes for one purpose but apply that revenue to other purposes and avoid liability through the offset doctrine, those cases are overruled. If there is to be an exception to the plain language of the statutes, it must come from the legislature.

## CONCLUSION

KRS 92.330 and 92.340 prohibit the use of the sanitation tax revenue for other non-sanitation purposes, and thus Sewell-Scheuermann has properly stated a cause of action on behalf of the City. The trial court should not have dismissed her claim pursuant to CR 12.02 and, to that extent, we affirm the Court of Appeals' opinion. However, we are willing to recognize the longstanding offset defense available to city officials such as the Defendants as valid in this case, and thus hold that the Court of Appeals erred in ruling otherwise. We thus reverse the Court of Appeals on that issue but must

26

remand for further proceedings. Specifically, the complaint acknowledges that the excess sanitation funds were spent on other "City budget items," but the validity of the expenditures was not conceded. On remand, the Defendants must establish how the excess revenue was spent so that the factual issue of the validity of those expenditures can be determined. To the extent they have other defenses that were not developed due to the CR 12.02 dismissal, the Defendants are entitled to present those as well. This case is remanded to the Jefferson Circuit Court for further proceedings consistent with this Opinion.

All sitting. Minton, C.J.; Cunningham, VanMeter, and Wright, JJ., concur. Venters, J., dissents by separate opinion, which Keller, J., joins.

VENTERS, J., DISSENTING: I agree with the Majority's conclusion that Audubon Park's sanitation assessment is a tax. However, I respectfully dissent because the Majority errs in applying the so-called "offset defense" to reduce the liability established by KRS 92.340 when private citizens initiate actions against public officials who violate § 180 of the Kentucky Constitution. The General Assembly has expressly defined the amount of liability owed by public officials who violate KRS 92.340, and the Court's obligation is to enforce the statute as written by the legislature. I also dissent from the Majority's re-articulation of the offset defense because it appears to broaden its scope.

## ANALYSIS

Appellants' problem begins with § 180 of the Kentucky Constitution, which says in plain unambiguous English:

27

Every act enacted by the General Assembly, and every ordinance and resolution passed by any county, city, town or municipal board or local legislative body, levying a tax, shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose.[13]

Condensed to its pertinent part, § 180 says that **"no tax levied and collected for one purpose shall ever be devoted to another purpose."** By its plain definition, "another purpose" means "*any* other purpose." The Constitutional framers added no postscript or epilog suggesting that this explicit prohibition should not apply to city leaders who divert tax revenue to other expenses or obligations incurred by a city that may incidentally benefit all taxpayers. The language of the prohibition is clear and absolute.

KRS 92.340 plainly provides:

> If . . . any city tax revenue is expended for a purpose other than that for which the tax was levied, or license fee imposed, each officer . . . who, by a refusal to act, could have prevented the expenditure, and the members of the city legislative body who voted for the expenditure, *shall be jointly and several liable to the city for the amount so expended.*

(emphasis added).

### A. *Our reduction of Appellant's liability is contrary to the Separation of Powers.*

---

[13] This exact language has been part of §180 since the adoption of the Kentucky Constitution in 1891. A 1996 amendment of § 180 removed a sentence authorizing the imposition of poll taxes, leaving the remainder unaffected. *See* 1996 c 98, § 1, amendment approved 11-5-96.

The General Assembly explicitly states that violators of the statute "shall be jointly and several **liable to the city *for the amount so expended*.**" The language could not be simpler or clearer:  the liability is **for the amount expended** upon any purpose other than the one for which the tax was levied. The statute grants no right to offset that liability simply because the wrongful expenditures incidentally benefited the taxpayers.  The General Assembly said in no uncertain or ambiguous terms, city officials are liable "for the amount so expended."  By what authority or common law theory does this Court alter that statutory directive?

The Court of Justice has a constitutional obligation under our strong separation of powers doctrine to respect the plain and unambiguous language of a statute.  "We are not at liberty to add or subtract from the legislative enactment nor discover meaning not reasonably ascertainable from the language used." *Beckham v. Board of Educ. of Jefferson County*, 873 S.W.2d 575, 577 (Ky. 1994).  "[I]t is neither the duty nor the prerogative of the judiciary to breathe into the statute that which the Legislature has not put there." *Commonwealth v. Gaitherwright*, 70 S.W.3d 411, 413 (Ky. 2002).  Nevertheless, the Majority opinion does exactly that.

With respect to another legislatively-created cause of action, the Kentucky Whistleblower Act, we said in *Pennyrile Allied Community Services, Inc. v. Rogers*:

> While some may doubt the prudence of a law that allows such an action, it is not the role of the judiciary to pass upon the wisdom of a statute. Our constitutional authority is to ascertain the meaning of the statute, based not upon what the legislature may

29

> have intended to say, but upon the meaning of what it
> did say.

459 S.W.3d 339, 344 (Ky. 2015).

I am sympathetic to the Appellant's dilemma. I presume they acted with the best of intentions and perhaps upon unsound advice, but sympathy for a litigant does not authorize this Court to flinch from its Constitutional duty to enforce the law as written by the legislature. This Court did not create the liability Appellants now face, and it is not our place to alter that liability.

Following this law is not difficult. If the garbage recycling program of the City of Audubon Park no longer needed all the money generated by Ordinance No. 0003 Series 2007 and money was needed for "another purpose," a legal solution was simple. City leaders could have repealed or reduced the garbage assessment and enacted a new ordinance to levy a tax devoted to that other purpose. Every person competent enough to hold a municipal office can read KRS 92.340 and know exactly the meaning of what the legislature said, what it did not say, and the consequences of ignoring the statute. The offset defense is not there.

### B. *Our precedent does not authorize the application of the offset defense.*

The Majority justifies its application of the offset defense on the premise that our predecessor court applied the offset defense to reduce the liability established for similar claims brought under Ky. Stat. § 3175, the forerunner of KRS 92.340. I respectfully disagree. Even under Ky. Stat. § 3175, the

30

legislature provided no offset defense, so, if our predecessor court excused liability on that basis, it too overreached its authority.

However, contrary to the Majority's analysis, *the offset defense was never applied in any case of liability established for a violation of Ky. Stat. § 3175.* In each of the cases cited by the Majority, the cause of action created by Ky. Stat. § 3175 was found to be inapplicable because the city officials never violated Ky. Stat. § 3175. Any liability imposed upon city officials was based upon their violations of duties imposed under *other statutes,* not the expenditure of funds for a purpose other than that stated in the taxing ordinance. Neither KRS 92.340, nor its predecessor, Ky. Stat. § 3175, nor Section 180 of the Constitution, contains any language from which this Court can surmise the legislative intent to reduce the amount of the liability explicitly stated in the statute.

Soon after the enactment of Ky. Stat. § 3175 in the 1890's, our predecessor court in *Duncan v. Combs* stated:

> the whole purpose of this statute is to prevent officers of a city from collecting from the citizens and taxpayers thereof money under a void ordinance, and the penalty imposed is both upon those who participated in the passage of such an ordinance and those who suffered the expenditure of money collected thereunder. This is the plain, unambiguous meaning of the statute.

115 S.W. 222, 224 (1909).

In *Duncan,* a citizen of Lexington filed an action against city officials pursuant to Ky. Stat. § 3175 to recover tax revenues raised for one purpose but diverted to another. The ordinance that levied the tax stated a purpose for the

31

tax. The *Duncan* Court noted that Ky. Stat. § 3175 created no liability under those circumstances, despite the obviously constitutional diversion. *Id.* at 225. The complaint was dismissed, and since no liability could be imposed, there was no mention of any "offset defense."

The next case to consider possible liability under Ky. Stat. § 3175 is *City of Newport v. McLane,* 77 S.W.2d 27 (Ky. 1934), where the Court again confronted a violation of Ky. Const. § 180 by city leaders. Citing *Duncan,* the Court again recognized that, despite the violation of § 180, Ky. Stat. § 3175 imposed no liability. The taxing ordinance did, indeed, state a purpose for the tax, so the diversion of that revenue fell outside the purview of Ky. Stat. § 3175.

The *McLane* Court recognized the Constitutional violation:

> There is no manner in which or any purpose for which a tax levied and collected for a distinctly specified purpose may thereafter be diverted so long as the purpose exists for which it was levied, without violating section 180 of the Constitution. The levying it for a distinctly specified governmental purpose is, ex necessitatas, an appropriation for a protected use, and a tax levy so appropriated is beyond the power of officials, in their discretion, to divert it.

77 S.W.2d at 31.

The Court held that this diversion of tax revenue by city officials was actionable under an alternate theory not based upon Ky. Stat. § 3175: the violation of the constitution and several statutes[14] other than Ky. Stat. § 3175,

---

[14] Specifically, those statutes are Ky. Stat. §§ 3190, 3192, 3194, and other provisions mandating the disposition of the tax revenue to a sinking fund for payment of the city's bonded indebtedness.

which, therefore, subjected city leaders to liability to the city as a breach of

their fidelity performance bonds: [15]

> The diversion [of tax revenue], as it is alleged in the
> petition, was a breach of their bonds. The [diversion of
> funds] being constitutionally invalid, it affords them no
> protection against their liability to the city arising out
> of the breach of the bond, though they acted in
> accordance with the resolution and thought they were
> doing what was best for the city. Neither expediency,
> nor an emergency created by their own actions, may
> be invoked to avert their liability arising out of their
> diversion of the city's fund in violation of the
> Constitution and in plain disregard of the Statutes.

*Id.* at 33. The "disregard of the Statutes" mentioned at the end of the foregoing

quote refers to Ky. Stat. §§ 3190, 3192, 3194, and other provisions mandating

the disposition of the tax revenue to a sinking fund for payment of the city's

bonded indebtedness, not Ky. Stat. § 3175.[16] The Court described the officials

---

[15] *McLane* at 28-29: "Section 3235c-27 mandatorily requires the mayor and each commissioner to execute a bond to the city in the penal sum of $10,000 each, conditioned on the faithful performance of his duties upon which an action may be maintained by any person or persons interested in the keeping of the covenants therein contained." A violation of a Constitutional provision would, of course, be a violation of the official's duty of "faithful performance."

[16] *City of Newport v. McLane*, 256 Ky. 803, 77 S.W.2d 27, 30 (1934): Section 3190 plainly requires the tax levied, collected, and deposited to the sinking fund, with which "to pay the principal and interest of the bonded indebtedness of the city," shall be "preserved exclusively for the payment of said liabilities." And section 3194 provides whenever "there shall be a surplus of said funds which cannot be applied on such terms to the extinguishment of said liabilities, the commissioners may invest the same in bonds of said city, for which it is liable in its corporate capacity, or in bonds of the state of Kentucky or of the United States; or may invest said funds in such other interest-bearing or dividend-paying securities as now authorized, or which may hereafter be authorized, by K. S. § 4706, or other general law of the state, for the investment of funds held by persons or corporations in a fiduciary capacity. Any loan or investment heretofore made of the sinking funds of a city of the second class which would be authorized and valid if made after this act takes effect, is hereby ratified." "All money, bonds and securities belonging to the sinking fund" are by section 3192

conduct as "an exemplification of the evil consequences of administrative officials diverting a public fund, in violation of section 180 of the Constitution and the Statutes prescribing and restricting their authority over it." *Id.* at 32.

The Court concluded that for this "violation of the Constitution and in plain disregard of the Statutes" in breach of their fidelity bonds, "[t]*he measure of the recovery as to the members of the board is the sum diverted.*" [17] *Id.* (emphasis added). The Court then graciously, but without statutory authority, reduced that liability to the extent that city leaders could show by clear and convincing evidence that the diverted money was used to pay valid "claims" against the city and "debts" of the city. Thus, was born the offset defense. *Id.* at 33.[18]

---

required to be "kept in a separate account, and such money, bonds and securities shall only be paid out or disposed of by the order of the commissioners of the sinking fund, and in case of money upon a warrant signed by the city clerk, countersigned by the auditor and approved by the mayor." These statutory duties are purely administrative, and in no sense legislative.

[17] The Court noted that the liability of the officials' sureties was limited to "the amount of their several bonds." *Id.*

[18] The precise articulation of the offset allowed was as follows: "We deem it proper to add that it will be competent for the commissioners and their sureties to plead the facts showing the debts and claims, to the payment of which any portion of the $79,067.70 was applied, were such as the departments to which same was apportioned by the resolution had the authority to incur and to show by clear and convincing evidence that when the sum paid thereon, out of the $79,067.70, is added to the other debts and liabilities paid out of the taxes levied for that year, the aggregate did not exceed the levy and estimated taxes thereunder for the year 1931, and to the extent that all debts and claims so paid for the year 1931 do not exceed the total estimated taxes for that year, they will be entitled to offset that portion of the claims and debts paid out of the $79,067.70 which, when so added to the other paid claims and debts, do not in the aggregate exceed the estimated taxes levied for the year 1931, against their liability for the $79,067.70, but no more." *McLane* at 33.

I reiterate, *McLane* did not apply the offset defense in connection with any liability under Ky. Stat. § 3175 because there was no liability under Ky. Stat. § 3175. That statute was not violated. The liability was assessed, and the "offset" applied, for the city officials' violation of their duty of faithful performance by violating § 180 and the above-cited statutes, which, in turn, violated their fidelity performance bonds under Section 3235c-27.

Thus, *McLane* does not stand as precedent authorizing the application of an offset defense for liabilities imposed under the successor statute, KRS 92.340. A few years later, the same situation recurred in *City of Newport v. Rawlings*, 158 S.W.2d 12 (Ky. 1941). Again, the Court noted that Ky. Stat. § 3175 "*imposed no liability* upon officers applying taxes collected under a valid ordinance to a governmental purpose other than that for which the tax was levied." *Id.* at 14. (emphasis added). Once again, the Court, instead, imposed liability based upon violations of *other statutes*, not Ky. Stat. § 3175.

For example, the city treasurer in *Rawlings* violated § 3142b-4 because he failed "to pay over the monies in his hands to the [police and firemen's pension] funds entitled thereto . . . a violation of duty imposed on him by statute and this failure of duty is a breach of his bond conditioned upon the faithful performance of his duty such as to render his surety liable." 158 S.W.2d at 16.

The city manager in *Rawlings* violated his statutory duties under § 3235dd-34, § 3235dd-37 and § 3235dd-38, requiring him to see "to the proper allocation of the tax monies to the various funds and a legal disbursement

35

thereof." The Court observed that "he permitted the diversion and unauthorized expenditure a violation of duty on his part is plainly alleged." *Id.*

These are not liabilities established under Ky. Stat. § 3175. With reference, not to the inapplicable cause of action created by Ky. Stat. § 3175, but to the violation of duties imposed under other statutes, the *Rawlings* Court followed *McLane*: "Under the rule announced in the *McLane* case, if it is established that the money diverted was used in payment of *valid obligations* of the city then there is no liability." *Id.* at 12. (emphasis added).

The Majority also cites *Daily v. Smith's Adm'x*, 180 S.W.2d 861 (Ky. 1944), which reiterated *McLane's* and *Rawlings'* use of the offset defense because "no injury or loss had resulted to the city because the money had been used for the payment of valid obligations." *Id.* at 864. Again, like *McLane* and *Rawlings*, liability was predicated upon the violations of specific statutes requiring the use of revenue to pay off bonded indebtedness. Neither KRS 92.340 nor Ky. Stat. § 3175 is mentioned in *Daily*.

The Majority also cites *Fannin v. Davis*,385 S.W. 2d 321 (Ky. 1964) as additional authority for offsetting liabilities of public officials. The offset defense is never mentioned, perhaps because *Fannin* has nothing whatsoever to do with diversion of tax revenue in violation of the Kentucky Constitutional § 180 or of any statute based thereon.

In summary, the Majority grants unlegislated immunity to city officials who violate the statute, and it, thereby, creates a disincentive for city officials to obey statutes and the Constitution. The kind-spirited but misplaced

36

forgiveness we grant Appellants paves a pathway for city leaders everywhere to avert their statutory liability. The legislature did not put an offset defense into the statute because it is antithetical to the purpose of the statute. Our insertion of the offset defense defeats the purpose of the legislation.

KRS 92.340 came into existence to deter city leaders who might be tempted to deceive the public with the "bait and switch" tactic of enacting a tax for an essential purpose but then using the tax to support less palatable or unpopular objectives. The ability of private individuals, "any person," to enforce the statutory mandate puts city leaders on notice that they will be held to personal account if they deceive the public about how their tax monies will be spent. The objective of that mandate is transparency and honesty in government. Section 180 prevents city leaders from abusing the taxpayers' willingness to pay taxes needed for a popular government service and then diverting that tax revenue to another, *i.e., any other,* purpose.

## C. *Expansion of the "offset defense."*

As established under *McLane and Rawlings,* the offset defense credited city leaders who violated specific statutes directly the specific allocation of tax revenues to specific purposes, but only to the extent that the diverted money was used to pay "valid obligations" of the city, which in both referred to valid claims against the city and debts of the city. The word "obligation" denotes something that the city has a legal duty, responsibility, or a binding commitment to pay. Those cases applied the offset to improper expenditures

37

that served the city by reducing its debts and valid claims, not expenditures that simply contributed to the general operating needs of the city.

The Majority opinion recasts that terminology, effectively allowing a further reduction of Appellants' statutory liability to the extent that the unconstitutionally diverted funds were spent "for proper municipal obligations," such as roads and police, which are simply normal operating expenses of a city.

There is a huge difference between diverting tax dollars to reduce the city's indebtedness, its "valid obligations," and using the misdirected funds for ordinary operating expenses. Both plainly violate § 180 of the Kentucky Constitution and KRS 92.340, but the former has at least the virtue of protecting the city's financial resources by paying its valid debts. The Majority's new articulation licenses city officials to unconstitutionally spend diverted tax revenue on anything they can justify as a proper expenditure under the city's operating budget, which is precisely what § 180 is intended to prohibit.

The Majority incorrectly invokes the presumption that the General Assembly implicitly intended to adopt the offset defense when it enacted KRS 92.340 because it was aware of the holdings of *McLane* and *Rawlings*. Those cases do not apply the offset defense to reduce any liability incurred for violating Ky. Stat. § 3175, so why would we presume the legislature intended it to apply in cases involving KRS 92.340, the successor of Ky. Stat. § 3175?

38

If the legislature is presumed to know the law, as interpreted by the Court, then the legislature was aware that *McLane* and *Rawlings* applied the defense *only* to reduce liability arising from the violation of statutes other than Ky. Stat. § 3175, and that it has never been applied to reduce a recovery grounded upon a statutory cause of action enforcing the mandate of § 180. I reject the Majority's proposition that the legislature's omission of any reference to the offset defense signals its tacit approval of our expansion of the statutory phrase, "liable to the city for the amount so expended," to state: "liable to the city for the amount so expended, *except to the extent that illegally diverted tax revenue was spent on a valid municipal obligation.*"

Our fundamental rules require the courts to apply statutory language in accordance with its plain and unambiguous meaning, and that courts should not add provisions to a statute that the legislature did not put there. The more accurate conclusion is that the General Assembly's explicit omission of an offset defense when Ky. Stat. § 3175 was rewritten as KRS 92.340, and the imposition of liability "for the amount" of any diverted expenditure in violation of § 180, strongly signifies the legislative intent to foreclose the possibility that the courts would extend the offset defense in the application of KRS 92.340.

## CONCLUSION

It was said in the oral arguments to this Court that imposing liability in conformance with the actual language of the statute, thus allowing no credit by way of an offset defense, will deter good-minded citizens from serving in civic offices. That argument is disproven daily by the thousands of city officials

39

serving throughout Kentucky who have no trouble complying with the literal commands of §180 and KRS 92.340. More importantly, our legislature and our Constitutional framers provided a bright line rule: do not take tax money levied and collected for one purpose and spend it on any other purpose, no matter how benevolent your intentions may be. For these reasons, I dissent. I would affirm the decision of the Court of Appeals and remand the case to the trial court for a proper application of KRS 92.340 as enacted by the General Assembly.

Keller, J., joins.

COUNSEL FOR APPELLANTS:

Jason B. Bell
Matthew C. Hess
BELL, HESS & VAN ZANT, P.L.C.


COUNSEL FOR APPELLEE:

C. Dean Furman, Jr.
FURMAN & NILSEN, PLLC


COUNSEL FOR AMICUS CURIAE,
KENTUCKY LEAGUE OF CITIES ("KLC"):

Morgain Mary Sprague
Jessica Miller
MEMBER LEGAL SERVICES


COUNSEL FOR AMICUS CURIAE,
BLUEGRASS INSTITUTE FOR PUBLIC
POLICY SOLUTIONS, INC.:

Erica Lynn Horn
Timothy Joseph Eifler
STOLL KEENON OGDEN PLLC